# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| | |
|---|---|
| IN THE MATTER OF: ) | |
| JAS PARTNERS, LTD., ) | |
| ) | |
| Appellant, ) | |
| ) | |
| v. ) | CASE NO.: 1:10-CV-303-TLS |
| ) | |
| R. DAVID BOYER, THE TRUSTEES ) | |
| OF INDIANA UNIVERSITY and ) | |
| INDIANA HIGHER EDUCATION ) | |
| TELECOMMUNICATION SYSTEM, ) | |
| ) | |
| Appellees. ) | |

## OPINION AND ORDER

This is an appeal of the bankruptcy court's approval of a settlement reached in an adversary proceeding brought by the Trustee of a Chapter 7 Estate against the Trustees of Indiana University (IU) and Indiana Higher Education Telecommunications System (IHETS). Appellant JAS Partners, Ltd., who is the Estate's largest creditor, argues that the bankruptcy court abused its discretion when it granted the motion to approve the settlement without requiring the Trustee to conduct an adequate investigation and analysis of the Estate's rights.

## STATEMENT OF THE CASE

On October 3, 2007, R. David Boyer, acting as Trustee on behalf of the Chapter 7 Debtor, Fort Wayne Telsat, Inc., filed a complaint against IU and IHETS in the bankruptcy court asserting a cause of action for turnover of an Estate asset. The asset at issue was an Instructional Television Fixed Service (ITFS) broadcasting license known as WLX236 (the License) that the

Federal Communications Commission (FCC) had issued to IU.[1] The Trustee asserted that the Debtor had a direct right to the License or to compel IU to assign the License to the Debtor (who was at that time standing in the place of Fort Wayne Public Broadcast Station (PBS)). Alternatively, the Trustee claimed that the Debtor was entitled to estoppel damages for expenditures it made in reliance on the expectation that IU would assign the License to PBS. On November 2, IU and IHETS filed an Answer and Affirmative Defenses. In March 2008, the Debtor settled its claim with IU and IHETS for $100,000 and the parties jointly petitioned the bankruptcy court to approve the settlement. On April 28, JAS filed its Objection to Joint Motion to Approve Settlement. JAS argued that the settlement was not in the best interests of the Estate, that the Trustee had a high probability of succeeding in the adversary proceeding, and the settlement was not a reasonable exercise of the Trustee's business judgment.

The matter was tried before the bankruptcy judge on December 5, 2008, and March 5, 2009. The bankruptcy court approved the settlement in a memorandum of decision issued on April 26, 2010. On May 6, JAS filed its notice of appeal, which was docket in the district court on August 31. JAS, the Trustee, and IU/IHETS have all filed briefs on appeal and agree that this Court has jurisdiction pursuant to 28 U.S.C. § 158(a)(1).

**RELEVANT FACTS**

In 1994, James Simon, on behalf of the Debtor, negotiated the use of excess channel

---

[1] The ITFS is now known as the Educational Broadband Service (EBS). It refers to a specific band of frequencies or spectrum licensed to educational institutions or non-profit education organizations for uses related to education and instruction. As with all broadcast power and frequency, it is strictly regulated by the FCC. While only a not-for-profit entity can hold a license for ITFS channels, it can lease a portion of its spectrum, known as excess capacity, to other users.

capacity related to the ITFS channels, specifically to WLX236, which consisted of four channels called the C Group. On March 28, 1994, the Debtor and PBS executed an "excess channel lease agreement" (Lease Agreement), which gave the Debtor the right to lease spectrum from PBS provided that PBS first obtained an assignment of the License to those channels from IU. The Lease Agreement stated that PBS intended to enter an agreement or understanding with IU in which IU would either assign PBS the License or permit PBS to seek a license for the four C channels at the Debtor's transmitter site. The Lease Agreement also stated that if IU or the FCC failed to grant the request to transfer the FCC license to PBS within twenty-four months from the date of the Lease Agreement, either party could terminate the agreement by written notice to the other party. The Debtor's only written contract with respect to the License was the Lease Agreement with PBS; the Debtor did not have any written contract with IU with respect to the C Group License.[2]

IU and PBS had ongoing communications with the FCC with respect to the License. In its application to the FCC in October 1995, IU sought the FCC's consent to assign the License to PBS and sought modification of the License in the name of PBS as the proposed assignee. Over a year after the initial application and in anticipation of the assignment, IU granted PBS, as the proposed assignee, permission to file a separate contingent application with the FCC to modify the facilities of C Group ITFS Station WLX236 to collocate with, and replicate, the facilities of the wireless cable system of the Debtor and to use digital modulation techniques. This modification request did not repeat the original assignment request, even though the parties still

---

[2] The Debtor did have two written ITFS excess capacity agreements with IU with respect to A Group and D Group licenses, dated March 30, 1995, and November 20, 1995.

intended the FCC to rule on that request. The FCC granted the modification request, but it did not address or grant the assignment request. In the absence of permission for the assignment, IU continued to act as the licensee. However, the Debtor spent $350,000 modifying and constructing facilities in anticipation of leasing three different groups of channels, including the C Group. Several FCC public notices issued in 2000 with respect to licensing renewal, assignment, and construction referred to PBS as the applicant or as the conditional licensee. However, on January 20, 2003, IU and PBS were still requesting FCC approval for the assignment. (1-29-03 Letter, JAS Ex. pp) (acknowledging that the FCC had not yet indicated that the assignment was granted and requesting, on behalf of IU, "that the FCC grant the assignment application, so that the plans of the parties can be completed"). The January 2003 correspondence was the last filing with the FCC concerning the License before the Debtor's bankruptcy proceedings were initiated on May 3, 2005. By letter dated May 17, 2005, PBS informed the Debtor that it was terminating the Lease Agreement because efforts to obtain an assignment of the License from IU to PBS had not been successful.

In October 2005, Boyer was appointed as the Trustee when the Debtor's case was converted to a bankruptcy under Chapter 7. On December 2, 2005, the Trustee, by special counsel Grant F. Shipley, filed a motion to assume leases, including the March 1994 Lease Agreement between PBS and the Debtor. PBS objected to the motion, in part, on the ground that conditions precedent to making the Lease Agreement operative never transpired because the assignment of the license from the Trustees of Indiana University to PBS did not occur, despite PBS's diligent efforts. On June 7, 2006, the bankruptcy court approved a compromise between the Trustee and PBS pertaining to the Debtor's assumption of the lease for the C Group

4

channels. It provided, in part:

> [PBS] disclaims any further interest in said channels or leases, and consents to the assumption of such leases and the sale or transfer of said leases by the Trustee, all without any warranty or representation by [PBS] that it validly holds, owns, leases or operates such leases or channels; but, to the extent it has rights in said channels, it consents to the assumption and assignment of such leases, rights and channels by the Trustee, subject to approval by the [FCC].

(Stipulation/Order ¶ 3, ECF No. 227.) This stipulation also provided that PBS acknowledged and the Trustee affirmatively represented that the Debtor had been using the channels and broadcasting on them since 1994 and through the date of bankruptcy. The Trustee then continued to use the channels and broadcast on them until December 2005, at which time all broadcasting ceased.

Upon obtaining the assumption of rights, and armed with the information gathered by special counsel Shipley during the assumption process, the Trustee directed counsel for the Estate to contact IU to pursue whatever rights the Trustee had acquired. In these communications, the Trustee was made aware of IU's position that the FCC never authorized an assignment of the License from IU to PBS and that IU was willing to aggressively litigate the adversary proceeding. The Trustee confirmed the absence of FCC consent for the assignment through his review of the discovery performed by Shipley, the FCC file, and his consultation with other FCC attorneys. The FCC Secretary confirmed under official seal that IU was the holder of the License. However, the Trustee had also discovered the FCC public notices relating to the License that referred to PBS (not IU) as the applicant. Based on these notices, the Trustee believed that he could assert a claim of right to the License, even if success on the claim was

5

remote.[3] The Trustee believed that the more viable claim was one for promissory estoppel based on the amounts the Debtor spent to construct transmission facilities in reliance on the expectation that IU and PBS would come to an agreement and consummate an assignment of the License.

On October 3, 2007, the Trustee filed adversary proceedings against IU and IHETS for turnover of the License. In negotiating settlement of the claims against IU and IHETS, the Trustee considered that taking action to obtain clear title to the License with the FCC would be time consuming, potentially expensive, and subject to rigorous opposition by IU. Proceeding on a theory of promissory estoppel, the Trustee computed the Debtor's costs of construction of facilities for three license transactions at $350,000. He attributed one-third of this expense, $116,000, to the C Group License. The Trustee estimated that the estoppel claim had a 30% chance of success. In response to the Trustee's demand letter based on these calculations, IU and IHETS offered to settle the claim for $10,000. Almost a year later, the Trustee obtained a settlement from IU and IHETS for $100,000. He advised that accepting the settlement was reasonable and in the best interest of the Estate.

**STANDARD OF REVIEW**

Under Federal Rule of Bankruptcy Procedure 9019(a), bankruptcy courts may approve adversary litigation settlements that are in the best interest of the estate. *In re Drs. Hosp. of Hyde Park, Inc.*, 474 F.3d 421, 426 (7th Cir. 2007); *Matter of Energy Co-op, Inc.*, 886 F.2d 921, 927

---

[3] IU counsel had already responded during the assumption process that the License was never assigned to PBS. In doing so, he acknowledged that the FCC public notices referred to by the Estate's counsel were admittedly confusing, but that his understanding was that the request for modification of the technical facilities was issued in the name of PBS because IU and PBS desired the new facilities in the event the License was assigned. Counsel asserted that the License always remained the property of IU, and that the proposed lease between IU and PBS never became effective.

(7th Cir. 1989); Fed. R. Bankr. P. 9019(a). The linchpin of the "best interests of the estate" test is a comparison of the value of the settlement with the probable costs and benefits of litigating. *In re Drs. Hosp. of Hyde Park,* 474 F.3d at 426. The value of the settlement must be reasonably equivalent to the value of the claims surrendered. *Id.* However, because litigation outcomes cannot be predicted with mathematical precision, only if the settlement falls below the low end of the reasonable range of possible litigation outcomes will it fail the reasonable equivalence standard. *Id.*

A bankruptcy court cannot simply accept the recommendation of the trustee, but must independently evaluate a settlement. *Id.* Among the factors the bankruptcy court considers are the nature and complexity of the litigation and its probability of success, together with the expense, inconvenience, and delay necessarily attendant in litigation, including the possibility that disapproving the settlement will cause wasting of assets. *Id.*; *In re Am. Reserve Corp.*, 841 F.2d 159, 161 (7th Cir. 1987). "[A] rigid mathematical formula to set dollar values on disputed claims" is not required "because to do so would create an illusion of certainty where none exists and place an impracticable burden on the whole settlement process." *Matter of Energy Co-op.*, 886 F.2d at 928–29 (internal quotation marks, ellipsis, and brackets omitted). A bankruptcy court should also consider the creditors' objections to the settlement, although the views of objecting creditors are not controlling. *In re Am. Reserve Corp.*, 841 F.2d at 161–62.

The bankruptcy court's approval of a settlement is reviewed deferentially, for an abuse of discretion. *In re Drs. of Hyde Park*, 474 F.3d at 426. Factual findings are reviewed for clear error. Fed. R. Bankr. P. 8013. The bankruptcy court is considered to be in the best position to consider the equities and reasonableness of a compromise. *In re Drs. of Hyde Park*, 474 F.3d at

7

426. If the bankruptcy court's decision demonstrates a command of the case, the reviewing court will not engage in second-guessing. *Id.*

**DISCUSSION**

The bankruptcy court did not abuse its discretion when it approved the settlement between the Debtor and IU/IHETS. The bankruptcy court concluded that the Trustee's investigation was adequate to provide him with information necessary to make an informed decision as to the parameters of the settlement, and that the compromise was in the best interests of the Estate. In reaching this conclusion, the bankruptcy court demonstrated a command of the case and a thoughtful consideration of the equities and reasonableness of the settlement. None of JAS's arguments, discussed below, demonstrate that the bankruptcy court abused its discretion.

JAS argues that the Trustee's investigation of the FCC records was inadequate and that the bankruptcy court abused its discretion by concluding that the Trustee would not have discovered any material facts by expending additional resources investigating the records. JAS argues that it was not sufficient for the Trustee to rely on the certified FCC record as dispositive proof that the Estate had no right to the License, particularly where he knew that the Debtor had used the License for almost ten years. JAS asserts that the Trustee should have undertaken an investigation of the history of filings with the FCC, which would have shown IU's agreement to transfer the License to PBS, and should have talked to IU and PBS representatives, which would have revealed their intentions regarding the assignment.

The Debtor does not dispute that FCC consent was a legal prerequisite to IU's ability to assign the License to another party. None of the numerous FCC filings or publications establish

8

that the FCC authorized an assignment, only that IU and PBS requested such authorization to no avail. The FCC materials also evidence that the agreement to assign was oral and would not be consummated until the FCC consented to the assignment. As the FCC experts testified before the bankruptcy court, it is not even clear from the documents that the FCC considered the assignment request to still be pending, or whether it instead interpreted the amendment to the FCC application for modifications to request digital authority as replacing the original request for permission to assign the License to PBS. There was, however, no question that the FCC's certified record showed IU as the record owner of the License, and that this record is dispositive of who currently holds the License.

Against this backdrop, JAS's argument appears to be that the Trustee should have further investigated and pursued a theory that would have required IU to complete the assignment of the License despite the FCC's failure to grant approval for the assignment. Under this theory, some contractual obligation outside of the FCC record would have had to exist for the Debtor to be able to compel IU to complete the assignment. JAS argues that the Trustee should have had discussions with persons with "knowledge of the circumstances regarding the transaction between IU and PBS" and "should have reviewed the files of IU and IHETS regarding the License to see what internal documents might reveal regarding IU's understanding of its agreement with PBS." (Appellant's Br. 14–15, ECF No. 4.) JAS does not indicate what these inquiries would have revealed about any arrangement between PBS and IU, and insists that it is not required to point to such evidence because it is the Trustee's burden to investigate.

The bankruptcy court inquired regarding whether the Trustee had enough information at the time of the settlement to cause him to form an educated analysis of the calculus of success or

9

failure of a claim related to a direct assignment. This information included the Trustee's (correct) belief that IU and PBS did not have a written contract for the assignment of the License. The only written agreement that existed was the Lease Agreement between the Debtor and PBS, which stated that it was contingent upon PBS first obtaining the assignment of the License from IU. The court also considered the Trustee's awareness of IU's and PBS's positions that the License had never been transferred and PBS did not have right to compel a transfer. JAS downplays the significance of IU's and PBS's representations regarding the License, but the Debtor had stepped into the shoes of PBS as it relates to any agreement with IU. Thus, PBS's position is indeed relevant and highlights the uncertainty of a favorable outcome for the Estate in the adversary proceeding between the Estate and IU. The parties' representations are also material to determining how much time and money would have been required to pursue an assignment of the License. JAS's argument that further discovery was required, regardless of whether it would have bolstered or defeated the Estate's claim, ignores the Trustee's duty to preserve Estate assets and to consider the probable costs and benefits of litigation. JAS notes that neither the Trustee nor IU proffered any witnesses or other evidence from their own records to substantiate their claim that IU had *not* agreed to transfer the License. This, of course, is not surprising as proof of a negative would be unexpected even after the completion of exhaustive discovery commensurate with trial-ready litigation. JAS does not suggest how much time and expense the Trustee should have gone to in search of evidence of a failure of the parties to agree or, alternatively, attempting to locate evidence of an agreement between PBS and IU. There is no evidence that the Trustee ignored a known source of information. In fact, the Trustee did review written documentation between the parties. The Trustee was aware that IU and PBS had written

agreements related to other channel groups. The Trustee also received and reviewed a written ITFS Cooperation Agreement between IHETS and the Debtor pertaining to the C Group channels, but that Agreement was never signed.

JAS attempts to liken this case to the bankruptcy court's decision in *In re Matter of Big Horn Land & Cattle Co.*, Case No. 09-10254 (Bankr. N.D. Ind. Mar. 22, 2010) (ECF No. 4-1). In that case, the bankruptcy court found that the trustee did not adequately investigate a claim. The claim involved litigation over a land sale contract between the debtor and another party. The other party prevailed at the state trial court level, but the trial court opinion appeared to adopt the other party's findings of facts and conclusions of law verbatim, providing the debtor with a strong argument on appeal. The trustee did not discuss the case with the debtor's state trial court counsel, instead relying solely on the state trial court judgment. The bankruptcy court determined that the trustee's reliance on the state court judgment without discussing the case with the debtor's state court counsel constituted a failure to adequately investigate the debtor's claim prior to seeking to settle the state court case, which was still pending on appeal. Here, the Trustee consulted experts, including the Debtor's FCC counsel who was involved in the assumption process. Moreover, unlike in *In re Matter of Big Horn*, JAS has not identified information that would have been produced through further investigation and should have been taken into consideration in making the decision to settle.

JAS also makes several references to the Trustee's lack of "formal discovery" as evidence that his investigation was inadequate. However, this characterization is unhelpful as it categorically dismisses any information the Trustee obtained before filing the adverse proceedings or through methods not recognized in the Rules of Civil Procedure. Formal

discovery is not the only method of performing an adequate investigation. Here, the Trustee reviewed the file of counsel who handled the Debtor's assumption of whatever rights PBS had to the License, obtained FCC filings and opinions from FCC experts as to the meaning of those filings, and communicated with counsel for IU and for PBS. In addition, the purpose of settling claims is to save money that would be attendant in further litigation. Parties "assess settlement offers by taking stock of the information they have, even if preliminary, and considering whether the possibility the case will improve is worth the risk of losing the settlement offer." *In re Doctors Hosp. of Hyde Park*, 474 F.3d at 430 (holding that estimates and preliminary solvency reports were sufficient to support the bankruptcy court's conclusion that the settlement was within the reasonable range of litigation outcomes).

The bankruptcy court did not abuse its discretion in concluding that, based upon the information known to the Trustee, further investigation was not necessary to exercise good business judgment and, in fact, would have been an additional expenditure of Estate resources without the discovery of anything material to the value of a potential settlement. It was reasonable for the Trustee to abandon the Estate's demand that IU assign it the License and instead pursue an estoppel claim given the FCC's failure to approve an assignment and the lack of a written agreement between IU and PBS or the Debtor *See Ind. Bureau of Motor Vehicles v. Ash, Inc.*, 895 N.E.2d 359, 367 (Ind. Ct. App. 2008) (noting that promissory estoppel or quasi-contractual remedies permit recovery where no contract in fact exists). The Trustee negotiated on a theory that the Debtor could recover the amount it spent modifying transmission facilities in reliance on representations that IU would assign the License to PBS. Under that theory, a settlement of $100,000 was well above the "low end of possible litigation outcomes." *In re*

*Doctors of Hyde Park*, 474 F.3d at 426.

JAS criticizes the Trustee for failing to determine the value of the License, and argues that it was incumbent upon the Trustee to show the value of the License in the Estate's hands. But the value of the License was not relevant if the Debtor did not have any right to it. JAS's argument only has merit to the extent that the calculation of the value of the claim to the License takes into account the likelihood that the License rightfully belongs to the Debtor. The bankruptcy court properly recognized that the problem with JAS's analysis of the potential high end value of the claim was that it assumed that the Trustee had a clear path to the interests of PBS regarding the assignment of the Lease. This Court agrees with the bankruptcy's court's assessment that given the Debtor's lack of any viable claim of right to the License and high risk of an adverse outcome, the low end value could reasonably have been zero, regardless of the market value of the License. A claim with a zero to near zero chance of recovery for any amount, no matter how large, has no meaningful economic value. *Cf. In re Polis*, 217 F.3d 899, 902 (7th Cir. 2000) (noting that the value of a legal claim is the judgment the litigator will obtain if she wins multiplied by the probability of a successful outcome); *see also In re Hilsen*, 404 B.R. 58, 71 (Bankr. E.D.N.Y. 2009) (noting that the benefit of a successful outcome in litigation must be discounted to reflect the likelihood of that outcome). The court concluded that based upon the Trustee's investigation, the expenditure of bankruptcy resources to obtain an actual appraisal of the License under a best case scenario would not have been justified. A bankruptcy court "must do neither more nor less than canvass the issues and see whether the settlement falls below the lowest point in the range or reasonableness from the perspective of the bankruptcy estate." *In re Hilsen*, 404 B.R. at 70 (internal quotation marks omitted); *see also In re W.T. Grant Co.*, 699

F.2d 599, 608 (2d Cir. 1983). Nevertheless, the bankruptcy court did engage in a detailed discussion regarding the value of the License that led it to conclude that JAS's estimate was based upon facts that did not come close to mirroring the circumstances that would have existed had the Debtor actually held the interest in the License. Thus, the court concluded that the information the Trustee lacked would not have been a materially significant addition to the Trustee's valuation of any proposed settlement.

In view of the above, this Court finds that the bankruptcy judge apprised himself of the facts necessary to compare the value of the settlement with the probable costs and benefits of litigating the License claim and to make an informed and independent judgment about the settlement. This included a consideration of the facts known to the Trustee as well as those that JAS contends that the Trustee should have been aware but was not. Moreover, there was an adequate factual basis upon which the bankruptcy judge could conclude that the settlement fell within the reasonable range of litigation possibilities and was in the best interests of the Estate. The bankruptcy judge did not abuse his discretion in approving the proposed compromise between the bankruptcy Estate and IU.

## CONCLUSION

For the foregoing reasons, the Court AFFIRMS the Order or Decree of the Bankruptcy Court dated April 26, 2010, granting the Amended Motion to Approve Settlement and denying the Objection to Joint Motion to Approve Settlement.

SO ORDERED on April 19, 2011.

  s/ Theresa L. Springmann  
THERESA L. SPRINGMANN  
UNITED STATES DISTRICT COURT